# UNITED STATES DISTRICT COURT

for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 922(g)(1) & 933 | ) ) ) ) ) |

Case No.  23-SC-1882

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 U.S.C. §§ 840, 841 (drug trafficking offenses) and 18 U.S.C. §§ 922(g), 924(c), 933 (firearms and ammunition offenses) . | |

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Natasha Vorotnikova, Special Agent

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:  8/22/2023

*Judge's signature*

City and state:  Washington, D.C.

G. Michael Harvey

(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means              ☑ Original              ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>INFORMATION ASSOCIATED WITH ONE ACCOUNT<br>STORED AT PREMISES CONTROLLED BY ONE PROVIDER<br>PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF<br>VIOLATIONS OF 18 U.S.C. §§ 922(g)(1) & 933 | )<br>)<br>)    Case No.  23-SC-1882<br>)<br>)<br>) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment  A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____September 04, 2023_____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____G. Michael Harvey_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____8/22/2023_____          _____
                                                                                              *Judge's signature*

City and state: _____Washington, D.C._____          _____G. Michael Harvey_____
                                                                                              United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>23-SC-1882 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
| <br>        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br><br>Date: _____                    _____<br>                                                                                           *Executing officer's signature*<br><br>                                                                             _____<br>                                                                                           *Printed name and title* |

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with iCloud account **ebmceoface@icloud.com** (active on, but not limited to, May 19, 2023), that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

### Particular Things to Be Seized

**I.        Information to be Disclosed by Apple Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple Inc. ("Apple"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Apple, or have been preserved pursuant to a July 25, 2023, request under 18 U.S.C. § 2703(f) (reference ID 202300311422), Apple is required to disclose the following information to the government, in unencrypted form whenever available, for the account described in Attachment A:

a.        All records or other information regarding the identification of the accounts, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the accounts were created, the length of service, the IP address used to register the accounts, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.        All records or other information regarding the devices associated with, or used in connection with, the accounts (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.        For data backed up to iCloud before May 20, 2023, the contents of all emails associated with the accounts including stored or preserved copies of emails sent to and from the accounts (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.      For data backed up to iCloud before May 20, 2023, the contents of all instant messages associated with the accounts, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the accounts (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.      For data backed up to iCloud before May 20, 2023, the contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.      For data backed up to iCloud before May 20, 2023, all activity, connection, and transactional logs for the accounts (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      For data backed up to iCloud before May 20, 2023, all records and information regarding locations where the accounts or devices associated with the accounts were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the accounts, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within

**FOURTEEN (14) DAYS** of the issuance of this warrant to Bureau of Alcohol, Tobacco, Firearms

& Explosives Special Agent Natalia O. Vorotnikova.

2

## II.     Information to be Seized by the Government

All information described above in Section I that constitutes fruits, contraband, evidence, instrumentalities, and information relating to violations of Title 21 U.S.C. §§ 840, 841 (drug trafficking offenses) and 18 U.S.C. §§ 922(g), 924(c), 933 (firearms and ammunition offenses) (collectively, the "TARGET OFFENSES"), as described in the affidavit submitted in support of this warrant, including, for the account described in Attachment A, information including any stored electronic data, that contains, constitutes evidence of, documents, establishes, identifies, or reflects:

A.     the identity of the person(s) who created or used, and continue to use, the account, including records that help reveal the whereabouts of such person(s);

B.     how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the TARGET OFFENSES and to the account user;

C.     the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the TARGET OFFENSES; or (ii) communicated with the account about matters relating to the TARGET OFFENSES, including the contents of their communications and records that help reveal their whereabouts;

D.     the account user's state of mind (*e.g.*, intent, absence of mistake) or preparation, planning, knowledge, and experience, related to the TARGET OFFENSES;

E.     the commission of the TARGET OFFENSES;

F.     the ownership and use of the account by the individual committing the TARGET OFFENSES;

G.     locations where the suspect committed the TARGET OFFENSES, and traveled to before and after the commission of the TARGET OFFENSES, including in preparation for the TARGET OFFENSES;

H.     meetings and communications between the suspect and other individuals discussing the commission of the TARGET OFFENSES;

I.     the obtaining, secreting, transfer, expenditure and/or concealment of controlled

substances, to include photographs and videos depicting controlled substances;

J.      the purchase of items with the assets derived from the unlawful distribution of controlled substances;

K.      the suspects' access to, purchase of, possession of, or relationship with, stash houses, firearms, and suppliers and purchasers of controlled substances;

L.      the suspects' access to, purchase of, sale of, possession of, or relationship with, firearms and ammunition, including but not limited to the two Glock 22 .40 caliber handguns and Glock 19 9mm handgun recovered on April 20, 2023 ; and

M.      the obtaining, secreting, transfer, expenditure, and/or the concealment of firearms.

## III.    Government Procedures for Warrant Execution

The United States government will conduct a search of the information produced by Apple and determine which information is within the scope of the information to be seized specified above in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information provided by Apple that does not fall within the scope of Section II and will not further review the information absent an order of the Court.  Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the Bureau of Alcohol, Tobacco, Firearms

and Explosives may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO
FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Apple Inc. ("Apple"), and my title is _____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Apple. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Apple, and they were made by Apple as a regular practice; and

b.      such records were generated by Apple's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Apple in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Apple, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____

Date                                                         Signature

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY ONE PROVIDER PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATIONS OF 18 U.S.C. §§ 922(g)(1) & 933 | 23-SC-1882 |

*Reference:*      *USAO Ref. # 2023R00861; Subject Account: ebmceoface@icloud.com*

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent ("SA") Natalia Vorotnikova, (herein "I" or "your affiant"), being first duly sworn, hereby depose and state as follows:

**INTRODUCTION**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain iCloud account—**ebmceoface@icloud.com**—that is stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I, Natalia Vorotnikova, have been a Special Agent with ATF since March of 2018. I am currently assigned to the ATF Washington Field Division's Group V.  My assignments include investigating individuals who are involved in the illegal possession and transfer of firearms, violent crimes involving firearms, and narcotics and firearms trafficking.  I have conducted and participated in electronic surveillance operations, executed search warrants and arrest warrants, developed sources of information, and conducted international operations that collaborated with multiple law enforcement entities.

3.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code ("U.S.C.").

4.      I received formal training at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I successfully completed the Criminal Investigators Training Program (CITP), which familiarized me with basic narcotic investigations, drug identification, drug detection, familiarization with United States narcotics laws, financial investigations, money laundering, identification and seizure of drug-related assets, organized crime investigations, physical and electronic surveillance and undercover operations. In addition, I successfully completed a fourteen-week, ATF Special Agent Basic Training ("SABT") course in Glynco, Georgia.  SABT included comprehensive, formalized instruction in, amongst other things: firearms identification, firearms trafficking, arson investigations, explosives identification and investigation along with alcohol and tobacco diversion.  I have a Bachelor of Science Degree in Criminal Justice from Winona State University in Winona, Minnesota.

5.      I have received training over my career in arrest procedures, searches, seizures, search warrant applications, and various other topics.  In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics and the organization of drug conspiracies.  These techniques include the use of cellular phone technology and cellular devices, and I have gained experience in investigating offenses in which cell phones store and contain items of evidence relating to certain offenses.  In the course of my duties, I have learned and experienced that criminals regularly use and carry cell phones to communicate before, during, and after criminal activity.  Additionally, criminals commonly communicate through phone calls, text messages, and other types of social media messaging applications, such as Instagram, to conspire to commit crimes and coordinate logistical matters immediately before, during, and after criminal activity.

6.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers/agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

7.      As a result of my personal participation in this investigation, as well as through interviews with and analysis of reports submitted by other law enforcement officers who are involved in this investigation, I am familiar with the aspects of this investigation.

8.      Based on my training and experience and the facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 21 U.S.C. §§ 840, 841 (drug trafficking offenses) and 18 U.S.C. §§ 922(g), 924(c), 933 (firearms and ammunition offenses) (collectively, the "TARGET OFFENSES") have been committed by Christopher MITCHELL (hereafter, "MITCHELL").  There is also probable cause to search the TARGET

DEVICE, further described in Attachments A for the things described in Attachment B.  There is also probable cause to search the iCloud account **ebmceoface@icloud.com**, further described below and in Attachment A, for the things described in Attachment B.

## JURISDICTION

9.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a "district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

## PROBABLE CAUSE

### *April 20, 2023, Arrest of MITCHELL*

10.      On April 20, 2023, Metropolitan Police Department Mountain Bike Tac Unit was assigned to PSA 101, Chinatown, for their tour of duty for crime patrol presence. The Mountain Bike Tac Unit was working in full duty uniform, utilizing police mountain bikes. The Mountain Bike Tac unit was assigned to this area due to a recent shooting, and multiple citizen complaints for drug use and drug distribution near the 810 5th Street NW shelter.

11.      Mountain Bike Tac Officers were riding through the alleyway next to the shelter and observed a group sitting on the steps of 819 6 Street NW. Mountain Tac Officers are familiar with this area and have moved groups along from blocking the entrance of the private property. While speaking to the group and moving them along, an unidentified individual removed a black

plastic bag from the fence near the steps and threw the bag into a trash can. The unidentified individual then made a statement something to the effect of, this isn't mine.



*Bag tied to the fence that was later discarded*

12.     After the property was abandoned in the trash can, Officer Brattain opened the bag and observed a large bag of marijuana, a scale, multiple empty sandwich baggies, and an Acura car key fob. Due to the large bag of marijuana, scale, and multiple sandwich baggies, Officer Brattain suspected marijuana was being sold. Officer Brattain then pressed the lock button on the Acura car key, and immediately heard a vehicle beep. The vehicle that responded to the Acura key

fob was a 2004 Acura SUV, bearing Maryland license plate 9FH5117, parked approximately two spaces south of the initial interaction.

13.    Initially, an unidentified individual sitting near the scene asked about the marijuana. Officer Thermidor asked whether it was his, and at first, the man stated, "it ain't mine but it can be." Officers continued talking about the contents of the bag in front of the man. The man then said to Officer Brattain, "let me get that weed." Officer Brattain asked, "that's yours?," and the man replied, "that's my weed but I don't know about the rest of that shit." Officer Brattain asked if he also wanted the scale with the weed, and the man replied, that he only wanted "the weed." Officer Brattain stated that he did not believe the man.

14.    A few minutes later, another male, later identified as Christopher MITCHELL, who will now be referred to as MITCHELL for the remainder of this report, approached Officers inquiring about getting his car key. Officer Brattain advised MITCHELL his car key was discarded in the trash can by someone, which also contained a large amount of marijuana, a scale, and baggies. MITCHELL denied having anything to do with the marijuana; however, claimed the key to the vehicle was his mother's. MITCHELL then pulled from his pocket a bag containing what

he identified as his personal stash of marijuana and advised officers that he knew the quantity he was allowed to carry.



*MITCHELL showing officers the package of marijuana on his person*

15.     Officer Brattain then requested MITCHELL's name and date of birth to conduct a criminal database check, in which MITCHELL provided. The MITCHELL then stated something to the effect of, I do not have any warrants, I just left my probation meeting. Officer Brattain asked what MITCHELL was on probation for, and MITCHELL stated, "Felon in Possession". Officer Brattain then asked MITCHELL if there were any guns in the car, which MITCHELL denied.

Officer Brattain then asked if a K9 gun dog came to the scene, would they be alerted to any firearms in the vehicle. MITCHELL paused, looked down, and stated "no sir".

16.    Due to Officer Brattain's training and experience, Officer Brattain was aware individuals often store firearms in vehicles near the area where narcotics are distributed. At that time, Officer Brattain requested a K9 gun dog to respond and conduct a sweep of the vehicle.

17.    Officer Tyson arrived on scene to assist. Officer Tyson spoke with MITCHELL and asked if he had any narcotics on his person. MITCHELL pulled a small bag of marijuana out of his front pants pocket, and stated he just had "weed". Officer Tyson then asked MITCHELL for consent to search his person for any other narcotics. MITCHELL then gave permission to Officer

Tyson to search him. Officer Tyson then asked MITCHELL again, and asked if he was sure Officer

Tyson could search him. MITCHELL again gave permission for Officer Tyson to search him.

18.     Officers recovered a purple Apple iPhone bearing IMEI 356555100942328 and a

blue Apple iPhone with IMEI number 356683116242853 from MITCHELL's person.



*MITCHELL holding a blue iPhone and a purple iPhone*

19.     Officer Tyson recovered a large bundle of cash from MITCHELL's right front

pants pocket totaling $3,818.86 and a twisted sandwich baggie containing blue pills in

MITCHELL's left front pants pocket. Officer Tyson then detained MITCHELL and continued the

search. During the search, Officer Tyson felt a hard rock like substance in MITCHELL's ground

area. Officer Tyson then advised MITCHELL he would have to voluntarily remove the item from

his groin area or be subject to additional charge if he were to be transported to the cellblock and

they discovered the item. MITCHELL was then let out of handcuffs, retrieved the item from his groin area, and threw a baggie with a white crystal-like substance on the ground, which later field-tested positive for amphetamine.

20.     Officer Tyson and Officer Brattain then looked through the Acura's front driver's side window and observed the same white crystal-like substance laying on top of the driver's side floorboard. Officer Brattain decided to wait for the K9 arrival before searching the vehicle.



*White substance on the floorboard and seat, which field tested positive for amphetamine*

21.     MITCHELL's mother arrived on scene and was advised of the investigation. MITCHELL was requesting his mother receive the car keys to the vehicle. Officers advised MITCHELL that they would not be able to give her the keys at this time as there may be something else in the vehicle they would need to investigate. MITCHELL then requested Officer Thermidor

walk him over to the vehicle. MITCHELL then advised Officer Thermidor to open the front passenger door and open the glove box. Officer Thermidor opened the door and then the glove box and observed a handgun.

22.      MITCHELL then advised Officer Tyson that there were two more firearms in the backpack. A backpack was located in the backseat of the Acura, which contained two more handguns.

23.      Officer Brattain field tested the loose white crystal-like substance observed in plain view on the front driver's side floorboard. The white crystal-like substance yielded a positive color indication for Amphetamines.

24.      At this time, Officers Brattain and Tyson conducted a more detailed search of the vehicle. The following recovered narcotics and their locations within the vehicle are as follows:

- Center console:

  - Five bundles of white rock-like substance weighing 145.2 grams with packaging (Field tested by Officer Thermidor at the First District Station, which yielded a positive color indication for Amphetamine)

- Rear driver's side floorboard:

  - Plastic bag containing five bags of suspected synthetic cannabinoids (1 bag: 21 bundles weighing 86.2 grams with packaging, 2 bag: 24 bundles weighing 53.7 grams with

packaging, 3 bag: 126.8 grams weighing with packaging, 4 bag: 49.4 grams weighing

with packaging, 5 bag: 26.5 grams weighing with packaging). A total of 342.6 grams.

- Driver's side door panel:

  - Three digital scales with white residue.

- Front passenger's seat:

  - Jacket containing a ¼ full bottle of suspected Promethazine.



*Narcotics recovered during MITCHELL'S arrest and the search of the vehicle*

25.     The plastic bag thrown away by the unknown individual containing MITCHELL's

car keys contained a bag of marijuana weighing 118.7 grams with packaging. Another digital scale

with marijuana residue was recovered inside this bag as well. The marijuana was field tested by Officer Thermidor at the First District Station, which yielded a positive color indication for THC.

26.     The baggie of white crystal-like substance MITCHELL removed from his crotch area was weighed at 22.5 grams with packaging. The baggie of white crystal-like substance was field tested by Officer Thermidor at the First District Station, which yielded a positive color indication for Amphetamine.

27.     The 24 blue pills recovered from MITCHELL's left front pants pocket were marked "M/20". Officer Brattain searched the markings on drugs.com and discovered the pills were morphine.

28.     Officer Brattain spoke with MITCHELL's mother regarding the vehicle. MITCHELL's mother noted the vehicle is registered to her; however, she gave the vehicle to her

son to drive daily. MITCHELL's mother noted that he works at the Shake Shack in Chinatown. The address of this establishment is approximately four blocks from where the vehicle was parked.

29.    Closed-circuit television ("CCTV") was later obtained from 6th and H Streets, NW. The footage revealed that MITCHELL was driving the Acura, and also appeared to be carrying a large black bag.

30.    Department of Forensics Officer Vann, call sign CSU 62, responded to the scene to process the three handguns. The firearms descriptions and locations within the vehicle are as follows:

- Glove box:

  - Glock 22 .40 caliber pistol, bearing serial number XUH426 on slide and frame and SZH479 on barrel. The firearm was loaded with fourteen (14) rounds of ammunition, one (1) in the chamber and thirteen (13) in the magazine

  - Magazine loaded with thirty (30) rounds of ammunition



*Handgun recovered in the glove box*

- Backpack in backseat:

  o Glock 22 .40 caliber pistol, bearing serial number RU543US. The firearm was loaded with fifteen (15) rounds of ammunition

  o Glock 19 9mm caliber pistol, bearing serial number BZSW890. The firearm was loaded with sixteen (16) rounds of ammunition, including fifteen (15) in the magazine and one (1) in the chamber



*Two firearms recovered in a backpack*

31.     All firearms appeared to be fully functional, are designed to expel a projectile by the action of an explosive, have a barrel length of less than twelve inches and are capable of being fired by the use of a single hand.

32.     The firearms and ammunition in this case were manufactured outside of the District of Columbia, and therefore traveled in interstate commerce.

33.     Upon running a criminal history check of MITCHELL, Officer Brattain discovered that he was convicted on March 5th, 2021, for being a felon in possession of a firearm in case

number 2020 CF2 006785, which was an offense punishable by incarceration for more than one year.

34.     Due to the above statement of facts, MITCHELL was placed under arrest and transported to the First District for processing. The United States Attorney's Office for the District of Columbia "no papered" MITCHELL's arrest with respect to the recovered firearms and suspected drugs.

35.     A query for a License to Carry a Firearm was sent to the Joint Strategic & Tactical Analysis Command Center. Criminal Research Specialist Mehrtens submitted a return with the following: "Christopher Mitchell (DOB: 04/25/1998) was queried through the DC gun registry and WALES with negative results."

36.     Following the arrests, law enforcement obtained and executed Buccal warrants to acquire MITCHELL's DNA for potentially matching to samples taken from the recovered firearms.  The results remain pending.

37.     On May 2, 2023, Apple Privacy & Law Enforcement Compliance determined that MITCHELL's telephone number 202-246-1001 has been associated with FaceTime and iMessage; but has not been associated with a customer account.

38.     On May 9, 2023, United Stated District Court Search Warrant # 23-SW-140 was obtained for a purple Apple iPhone bearing IMEI 356555100942328 and a blue Apple iPhone with IMEI number 356683116242853, recovered during MITCHELL's April 20, 2023, arrest. The warrant was signed by United States Magistrate Judge Zia Faruqui. However, the government was unable to gain access to the phones.

39.     On May 18, 2023, MITCHELL was indicted by a federal grand jury on six counts, including violations of 21 U.S.C. §§ 841(a)(1), 860 and 18 U.S.C. §§ 922(g)(1), 924(c).  The case

was docketed as *United States v. Christopher Mitchell*, 23-CR-176. On May 24, 2023, a magistrate judge held MITCHELL without bond pending trial.

### *May 19, 2023, Arrest of MITCHELL*

40.     On May 19, 2023, prior to the tour of duty, Officer Brattain received a Federal Indictment warrant from the Unites States Attorney's Office for MITCHELL. The warrant was issued on May 18, 2023. Officers were informed by a probation officer that MITCHELL was at 422 2nd Street NW Washington, DC 20001.

41.     Officers Brattain, Officer Sadat, Officer Thermidor, and Officer Reynoso were all equipped with body worn cameras and were working in full duty uniform, utilizing police mountain bikes, responded to 422 2 Street NW Washington, DC 20001, where MITCHELL was.

42.     Sergeant Rathbun, Officer Brattain, and Officer Davis observed MITCHELL leaning on the same Acura SUV that was searched on April 20, 2023.  MITCHELL was taken into custody without incident.

43.     A search incident to arrest was conducted. Officer Reynoso recovered the set of Acura keys in MITCHELL's left front pants pocket.  Officer Reynoso then recovered a large baggie with a white crystal-like rock substance from MITCHELL's right front pocket. Officer Reynoso then recovered U.S. Currency from multiple clothing pockets on MITCHELL's person.

The U.S. Currency was later counted at the First District Station to a total of $1,596. The $1,596 was seized as proceeds.



44.     While the search incident to arrest was being conducted, Officer Brattain observed a white crystal-like rock substance on the front driver's and passenger's side floorboard inside the blue Acura SUV. Officer Brattain then field tested the white crystal-like substance recovered from the MITCHELL's person, which yielded a positive color reaction for Amphetamine. The white

crystal-like substance in plain view on the Acura's floorboard was consistent with the Amphetamine recovered from MITCHELL's person.



45.     Officer Brattain then pressed a button on the Acura key fob and the front turn signal lights on the blue Acura flashed. The Acura's Maryland plate 9HF5117 was queried through the First District Dispatch, which returned to a blue in color 2004 Acura Tk SUV.

46.     Due to the nexus between the narcotics on MITCHELL and MITCHELL being in possession of the keys to the Acura, coupled with the suspected narcotics in plain view in the car, a probable cause search of the 2004 Acura Tk was conducted.

47.     Prior to a full search of the vehicle, Officer Wong field tested the white crystal-like rock substance in plain view on the front floorboards. The white crystal-like rock substance yielded a positive color reaction for Amphetamine. The remaining white crystal-like rock on the floorboard

was recovered by Officer Wong. During a full search of the vehicle, Officer Thermidor located a

black digital scale with a white residue in the front passenger's side door panel.



48.     During the arrest, officers recovered a purple Apple iPhone from MITCHELL's left

jacket pocket.



49.     The seized narcotics were later weighed at the First District Station by Officer Thermidor. The bag of amphetamine recovered from MITCHELL's person weighed a total of 76.5 grams with packaging. The recovered amphetamine from the front floorboards weighed 3.0 grams with packaging. Officer Thermidor also tested two portions of the 76.5 grams of amphetamine, one yielded a positive color reaction for amphetamine and the other yielded a positive color reaction for cocaine base. Officers believe the 76.5 grams bag of narcotics is a mixture of the two.

50.     On June 14, 2023, a magistrate judge issued Search Warrant Number 23-177, allowing the government to search the iPhone recovered from MITCHELL's person on May 19, 2023.  However, the government was unable to access nearly all of the content stored on the device,

e.g., images, chats, or videos.  The search identified "ebmceoface@icloud.com" as the Apple ID associated with MITCHELL's phone.

## BACKGROUND CONCERNING APPLE[1]

51.     Apple is a United States company that produces the iPhone, iPad, and that previously produced the iPod Touch, all of which use the iOS operating system.  Apple also produces desktop and laptop computers that use the Mac OS operating system.

52.     Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

    a.   Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

    b.   iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

    c.   iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via

---

[1]     The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at https://support.apple.com/kb/PH12519; and "Apple Platform Security," available at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

icloud.com on any Internet-connected device. For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com. iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents. iCloud Tabs and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

d. Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

e. Find My allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of iOS devices, as well as share their location with other iOS users. It also allows owners of Apple devices to manage, interact with, and locate AirTags, which are tracking devices sold by Apple.

f.  Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

g.  App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS.  Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

53.  Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

54.  Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means

of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

55.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "capability query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the "Find My" service, including connection logs and requests to remotely find, lock, or erase a device, are also maintained by Apple.

56.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's

computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

57.     Apple provides users with five (5) gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service (SMS) and Multimedia Messaging Service (MMS) messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.  Records and data associated with third-party apps, including the instant messaging service WhatsApp, may also be stored on iCloud.

58.     Based on my training and experience, I know that crimes carried out by more than one person often involve some amount of communication among those involved.  This may involve working out details of and preparing to carry out a premeditated crime, working together to cover up the crime afterwards, or simply arranging to meet up someplace where an unplanned crime would later occur.  Either way, I know from training and experience that messages typically stored in iPhones and backed up to the cloud are often used for this purpose and that an iCloud

account used by a participant in such criminal activity often contains evidence of communication among accomplices.  For instance, communication logs indicate who the account user was communicating with both immediately before and after the crime.  Similarly, your affiant has seen multiple examples of suspects communicating after a crime via text (or other online chat functions) to discuss where incriminating items have been hidden, where and what the police are doing to investigate the crime, and whether any witnesses have implicated them.  Indeed, MITCHELL was seen on surveillance footage arriving to the scene on April 20, 2023, with a potential co-conspirator, and is therefore likely to have messages in his account sent to his potential co-conspirator concerning the TARGET OFFENSES.

59.    Based on my training and experience, I know that people who commit crime in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (*e.g.*, GPS data), app usage information (*e.g.*, Internet search inquiries), and images or video recordings relevant to the criminal activity.  Specifically, law enforcement has repeatedly seen videos or photos on a suspect's phone taken at or near key points in the crime.  Such video and image files often include identifying landmarks, buildings, or backgrounds that help place the suspect at an important location related to the crime or have even exculpated the individual by placing the individual at a different location at the time of the crime.  Such videos or selfies that were taken at or near the time of the crime inculpate or exculpate the suspect by identifying the phone user's precise location at the time the photo or video was taken.  Similarly, such videos and photos often have geotags, or GPS data embedded in the file, enabling law enforcement to identify the precise location where the photo was taken.  Similarly, law enforcement has found evidence of suspects searching for directions to a relevant location by using Google maps or using

28

applications like Waze to avoid traffic.  Other phones record the directions and GPS information provided to the phone user when travelling from one location to another.  Furthermore, I know from training and experience that text messages and any app enabling communication with others often include communications that shed light on the cell phone user's location and activity during a particular time period.  For example, just as people making plans often update each other via text regarding when they will arrive somewhere or where they will meet, suspects often text with co-conspirators, friends, or other confidants regarding where they are going or when they plan on arriving to a location.  As such, evidence of the Account Users' location is likely to be found on records in their iCloud accounts.

60.     Based on my training and experience, I know that victims, witnesses, and perpetrators of crimes in Washington, D.C., often communicate between and among themselves before, during, and after the crime.  They communicate using text messaging, apps, social media, and calls via both typical phone calls and App-enabled calling methods, such as those available on Instagram.  In my training and experience, communications between suspects have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime.  Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation, such as threats sent to witnesses or victims after a crime.  Similarly, they are often featured in photographs and/or video recordings together, which provide key evidence in demonstrating the nature of their relationship. In addition, an examination of the account's contact list is often critical in establishing these relationships, as people who know each other typically have each other's information in their contact lists, and, outside celebrity accounts, people are unlikely to have complete strangers included in such lists.    Indeed, in this case, MITCHELL carried two phones on April 20, 2023,

and one phone on May 19, 2023; therefore, it is likely that information concerning drug and/or firearm sales are highly likely to be stored in the iCloud account.

61.     Based on my training and experience, I know that witnesses, and even perpetrators, often record criminal activity.  For example, witnesses have recorded school fights, attacks on public transportation, and police shootings and assaults.  Law enforcement has seen such videos shared and discussed amongst co-conspirators or friends on apps such as Instagram.  These videos have proven extremely crucial in investigations by depicting the crime itself.  Similarly, law enforcement has seen criminals take photographs of their victims and of themselves with the proceeds of a crime shortly after committing it.  Such photos, videos, screenshots, and related communications are often then stored in the backup of the user's phone.

62.     Based on my training and experience, I know that people who possess firearms (as well as drugs, unlawfully obtained money, and other contraband) like to take pictures of themselves with firearms to prove ownership or possession to their friends—sometimes called "trophy photos."  They will use a camera, cell phone with a camera, tablets with a camera and or personal computers to photograph and store photograph of firearms or themselves holding the firearm and other criminal activity that they may be involved in.  They also often share these images or video recordings with associates using text messaging or other forms of communication on their cell phone such as chat features or video and photo sharing on online social networking services, such as Instagram.  These photographs, videos, and electronic communications are excellent evidence of illegal gun possession.  Moreover, cell phone apps such as Instagram can be used for communications relating to the acquisition of firearms by those who cannot possess firearms legally, including the transmission of photographs of firearms available for purchase, with accompanying price information.  To the extent such photos and related communications about

30

the sale of the item occurred using an iPhone, they would be retained and stored on iCloud.  Indeed, in this case, MITCHELL arrived to the scene on April 20, 2023, and was seen speaking to potential associates.  Therefore, it is highly likely that communications with potential co-conspirators are likely to be stored in his iCloud account.

63.     Based on my training and experience in this context, I believe that the computers of Apple are likely to contain user-generated content such as stored electronic communications (including retrieved and unretrieved messages for Apple's subscribers), as well as Apple-generated information about its subscribers and their use of Apple's services and other online services.  In my training and experience, all of that information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  In fact, even if subscribers provide Apple with false information about their identities, that false information often nevertheless provides clues to their identities, locations, or illicit activities.

64.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

65.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

66.     Based on my training and experience, I know that suspects often delete incriminating items (such as photos, videos, texts, internet searches, and other communications) after committing a crime or learning that the police have developed leads.  This evidence is often highly relevant evidence, as it tends to be particularly incriminating.  For example, your affiant is aware of suspects deleting incriminating searches for news about the crime, texts or messages with coconspirators planning crimes, and texts or messages confessing to the crime.  The very fact that the items are deleted make them much more likely to be probative in the investigation.

67.     As explained above, information stored in connection with the Apple account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the investigating authorities to establish and prove each element of the offense or, alternatively, to exclude the innocent from further suspicion.

68.     Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.   In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

## METHODS TO BE USED TO ANALYZE DATA PROVIDED BY APPLE INC.

69.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices and electronic backups of digital devices, I know that:

a.     Searching electronic backups of digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records, and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar

facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or

deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.

70.   Moreover, numerous types of user information and metadata stored on a backup of a digital device are not susceptible to "word searches" or other narrowly targeted search techniques, including but not limited to images, audio and video recordings, and proximate GPS locations.  Likewise, the complex interrelatedness of data may undermine the efficacy of narrow search techniques based on the type, location, or date of information.  Indeed, the vast array of information that can be stored in an Icloud account can make it nearly impossible to determine the precise form and organization of user information and metadata prior to conducting a search. Finally, criminals can mislabel, misspell, or hide information; encode communications to avoid using key words; attempt to delete information to evade detection; or take other steps designed to frustrate law enforcement searches for information.

a.   For example, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

b.   Analyzing the contents of electronic backups of digital devices can be very labor intensive and also requires special technical skills, equipment, and

software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

c.      Based on all of the foregoing, I respectfully submit that searching any electronic backups of digital devices for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive

searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

d. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1. The analysis of the contents of the backup of digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such

storage areas exist that are related to the subject matter of the investigation.

2. In searching the backup of digital devices and information stored on the iCloud account, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

71.   If a customer elects to backup their device(s) using their iCloud account, Apple will store the encrypted backups. Depending on the user settings, Apple has the ability to un-encrypt the iCloud backup data. However, Apple is unable to apply a starting date filter to these datasets and provides the requested dataset either up to the end date listed in the legal process or if one is not provided, the date the legal process is executed. Apple can however use an end date to filter a request and provide all iCloud backup data in existence up to a specific end date. Apple is unable to apply a starting date filter to content and information in iCloud backups of device(s) and provides the requested dataset either up to the end date listed in the legal process or if one is not provided, the date the legal process is executed. Apple can however use an end date to filter a

request and provide all icloud backup data in existence up to a specific end date. As such, your affiant cannot ask Apple to limit the starting timeframe for this requested data.

## **CONCLUSION**

72.     Based on the forgoing, I request that the Court issue the proposed search warrant.

73.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Apple.  Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Respectfully submitted,

_N. Vorotnikova_

Natalia O. Vorotnikova
Special Agent
Bureau of Alcohol, Tobacco, Firearms
& Explosives

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) by telephone on August 22, 2023.

_____

Honorable G. Michael Harvey
United States Magistrate Judge

39